Mr. Chief Justice, and may it please the Court, the interpretation of the Recess Appointments Clause that Respondent urges would repudiate the constitutional legitimacy of thousands of appointments by Presidents going back to George Washington. And going forward, it would diminish presidential authority in a way that is flatly at odds with the constitutional structure the Framers established. Respondent simply has not advanced the compelling case that would be needed to strip Presidents of their traditional authority to make appointments during intra-session recesses and to fill preexisting vacancies. Is that correct? You think — you say that it would repudiate the constitutionality of appointments. You don't suggest that those — the actions of those appointees would be invalid going back however far you want to go back, do you? No, but they — no, I don't, Mr. Chief Justice. But it certainly would repudiate the legitimacy of those appointments. How did it — how did it affect the — how many board decisions will have to be redone? Or how did — how is the board coping with that problem? Well, there are many dozens of board decisions and perhaps many hundreds of board decisions that are under a cloud as a result of the D.C. Circuit's ruling in this case. And so the board will have a considerable amount of work to do if the D.C. Circuit's decision were to be affirmed. Now, there would be issues about waiver. There will be issues about whether there is authority sufficient to justify what the board did under other circumstances or apparent authority arguments. And so that would all have to be sorted out with respect to the board's ruling. What would happen if — under the reasoning of this case, what would happen to the decisions of recess-appointed judges, of which there's been quite a few? Well, I think that would be — I think that would be a very serious question, Justice Sotomayor, and I think it does point up the difficulty with the position Respondent is urging. Surely you would argue the de facto officer doctrine? Yes, we would. Of course you would. Yes, we would. But we've applied that in innumerable cases. None of us, but — You don't really think we're going to go back and rip out every decision made. Well, I would certainly hope not, Your Honor, but it certainly casts a serious cloud over the legitimacy of all of those actions. And it does point up the fact that the recess hour, including appointments during intra-session recesses and to fill preexisting vacancies, has been used to fill offices of great importance. My God, what a mistake. You started off by saying, you know, it would repudiate so many actions that have been taken. I have a very stark question. Suppose I agree with the Court of Appeals that the only interpretation of the Constitution is that the vacancy must have arisen during the recess of the judges by hypothesis. I agree with that, okay? What do you do when there is a practice that flatly contradicts a clear text of the Constitution? Which of the two prevails? Now, I think the practice has to prevail, Your Honor, but I do — So if you ignore the Constitution often enough, its meaning changes. But Your Honor, of course, in this situation, the meaning of the clause with respect to the timing of the vacancy has been a matter of contention since the first recess of the — You're questioning my hypothesis. You have to accept my hypothesis. I think I've answered the question, Your Honor. Let's assume that the text is clearly against you. Should I say, oh, yes, it says something else, but the practice for over 200 years has been something different, and it's the practice that must prevail? The practice has started with George Washington and has worked through — Yes or no? Does the practice prevail over the clear text? I think the practice gives meaning to the — the practice gives meaning to the Constitution — You're questioning my hypothesis again. I am assuming a clear text of the Constitution and a practice that is contrary to it. It's extremely unlikely that would arise if the text were so free of doubt, but — You do not want to answer my question. No, I'm answering it. I think I've already answered it once, Justice Scalia, but I'll answer it again. The answer is, I think, given the practice going back to the founding of the Republic, the practice should be — the practice should govern, but we don't have that here. This provision has been subject to contention as to its meaning since the first days of the Republic. Well, let me ask you about the premise. Vacancy is something that begins at a particular point in time and then it continues for some period. I was trying to think of some other things that might fall into the same category. One would be an appointment to a federal office. So you were appointed as Solicitor General at a particular point in time and the appointment continues. Another example might be a marriage. It happens at a particular point in time and it continues for a period of time. Now, would we say that your appointment as Solicitor General is happening today and will happen again tomorrow and happened yesterday? Is that the way the English language is used? But the word happens may not always be an apt phrase. The phrase may happen, the constitutional phrase, but it is a natural use. And if I may, Justice Alito, I'll give you a counterexample. If Congress enacted a statute in the summer of 2008 that said the Federal Reserve is invested with all powers necessary to deal with any financial emergency that may happen in 2009, if that emergency first arose in November of 2008, I don't think anybody would interpret that statute as denying the Federal Reserve the authority that Congress conferred. And that's because may happen. May happen won't cover every situation of a persisting state, but it's certainly a natural reading of it that covers some. And as Jefferson said, it's certain in this context, it's certainly susceptible of being interpreted as may happen. Carol, really, we've taken you off your starting point, and your starting point was, what is it, what constitutes a recess? And your position is that it can be an in-processing recess. But if we look back historically, Congress met, and they met continuously. And then they went on horseback back home, and they were away for six months, even nine months. Today, there's nothing like that, the intercession, the intercession recess to be an hour. So what do we do with that? There was the vision of a long recess running for months, and today, the intercession recess might be momentary. So I think there are two points to make in response to the question of what to do. The first one is that with respect to the original understanding, we do think that the term recess and the phrase the recess certainly at the time of the founding did encompass recesses that occurred during a session of Congress, during a session of the legislature, and not just in between sessions of the legislature. I would point the Court to Jefferson's Manual of Parliamentary Procedure, which describes a recess by adjournment as occurring within a session. I would point to the adjournment clause itself, which says if the one house of Congress wants to take a break of longer than three days during the session, it needs the consent of the other house, which indicates that the framers contemplated the possibility of a break longer than three days. I would point the Court to the parliamentary practice of the House of Commons, where the Speaker of the House of Commons had authority to call elections when a member died during the recess. Well, of course, Justice Ginsburg's question points out that your argument is, it seems to me, in search of a limiting principle, a lunch break, a one-day break. You've thought about this, a three-day break, a one-week break, a one-month break. How do you resolve that problem for us? Well, I think the way we resolve that problem is by looking to the adjournment clause. We think if it's a break that is sufficiently short that it wouldn't require the one house to get the consent of the other, that that's a de minimis recess, and that's not a recess in which the President would have authority. What about the pro forma sessions, then? Well — They don't — or correct me if I'm wrong — they don't require the consent of the other house. Well, but the problem with the pro forma sessions, I think, Justice Kennedy, is in thinking about the length of the recess. The recess we would submit — and this is based on the formal dictionary definition of recess at the time of the founding and now, which is a suspension of business — the recess was from January 3rd, when the session started, until January 23rd. And the reason, I think, that — So you think there's no recess during pro forma sessions? There is a recess, and the reason is because the Senate has issued a formal order that no business shall be conducted, and that's a formal — Let's just talk — let's focus on that. Instead of saying no business shall be conducted, the order said it is not anticipated that any business will be conducted. Does that suffice to eliminate that period as a recess? I think that that's a different case and I think conceivably a significantly harder case for the Executive because here — Well, it's difficult and harder, but it also suggests that you're just talking about a couple of magic words that the Senate can just change at the drop of a hat. So maybe the point is not that significant. Well, I think it is significant, Mr. Chief Justice. It's a formal action by the Senate by rule saying that no business shall be conducted. And in addition, there are other formal actions that the Senate took during this period that are confirming ambitia. The Senate passed a resolution that gave committees the authority to submit reports and report bills. They passed a resolution giving the President pro tempore the power to sign and roll bills. General, I think you're not answering the real thrust of the Chief Justice's question, which is that we could just be back here if we said, well, they didn't phrase this in the right way. Well, they'll phrase it differently and we would be back here with the same essential problem, that you're asking us to peg this on a formality that the Senate could easily evade. And that suggests that it really is the Senate's job to determine whether they're in recess or whether they're not. I think there has to be a limit to that point, Justice Kagan, because after all, what we're talking about here is a power that the Constitution gives to the President, a power in Article II, and the President's got to make the determination of when they're in recess. Well, why? You're making an assumption, which is that the Senate has to take a recess. But the Senate could choose if it wanted to, and I think there might be some citizens that would encourage it to, to never recess. Sure. Of course. And to work every day, which lots of people do. That's true. They could decide not to take a recess. That's absolutely true. But it seems to me that that is the choice that the Constitution puts out. So what do you say about the 20th Amendment, which says that that January 3rd was a meeting? Are you saying they violated the 20th Amendment, January 3rd, that says the Congress of the United States shall meet on January 3rd every year unless they appoint a different day? Yes. And they haven't. And therefore, they met in pro forma session. Or do you think it wasn't a meeting? And what do you think about the other part of the Constitution, says they can't adjourn a session for more than three days without the approval of the House, which they didn't have. So are you saying that the Senate violated those other two amendments of the two parts of the Constitution, or are you saying that they have different meanings in the three parts? I think our view is that it's hard to see how the — what the Senate did with pro forma sessions complies with either. Okay. So you're saying they violated — But if that — if they had pro forma sessions on January 3rd, they violate the 20th Amendment to the Constitution. You are saying that if they had a pro forma session on January 3rd, that since their meeting — their recess was still on and lasted more than three days, it was a violation of that adjournment clause of the Constitution. Now, that's one way to interpret it. The other way to interpret it is that if the Senate had a meeting on January 3rd, they would have met pro forma on those days. Or we could try to make — mean the same thing, which would mean it was up to the Senate. They consider that a meeting, it's a meeting? Well, but — or — What do we do? There is another option, Justice Breyer. Would you write that opinion, saying the Senate of the United States violated two — two provisions of the Constitution? No, I don't think you need to. Why not? Because you might perhaps give the Senate some deference with respect to requirements that apply only internally to the Congress. But when what you're talking about is the Senate's use of pro forma sessions in a manner that deprives the President of authority that Article II would otherwise give to the President. I mean, that's my basic question, really. Why is this an important case? I see what you're saying on this one. That's fine for an answer. So why is — what my really basic question is, why is this an important case in your opinion? Now, you've said, oh, because there are thousands of recess appointments. Not on the Happen Clause. You've listed 7,600 or so, really, on the recess part. But on the Happen Clause, you've only been able to find 102. And moreover, we've had an example of — where this Court, for better or for worse, said that two members of the Board is not a quorum. And we got some more members. They dealt with the problem. They ratified all those opinions. They dealt with it. It didn't take them too much time. So — and we have different political parties taking absolutely opposite sides, it seems to me, or some members thereof, depending on the political party of the President. And we have a clause that had to do with the Constitution and the problem of intro session recesses when there were seven months and nobody could meet. Okay? That isn't true anymore. So, explain to me — I'm not saying you're wrong. I just want to hear from your mouth why this is an important case. So, it's important for multiple reasons, with respect to practicalities and fundamental questions of constitutional structure. Let me start with practicalities and with the happenest point, the may-happen point, that our appendix doesn't purport to be comprehensive or anything like comprehensive. Part of the reason why it can't be comprehensive is that there really aren't records of when the vacancy first arose with respect to huge numbers of recess appointments, and that's because, I submit, it wasn't considered material. But second, I can — there are numerous practical examples in our history of when it made a very great deal of difference that the President had the authority to make an appointment to a vacancy that preexisted the recess. We mentioned the 1948 example. The Secretary of Labor dies on the verge of a very extended intro session recess by the Senate. They're going to be out for a month, back for 12 days, and then out all the way in June — they go out in June, they're out for a month, they're back for 12 days, and then they're out all the way until December 31st. The Secretary of Labor dies just in advance of them going out in June, and this is — remember, 1948 is a period of significant labor unrest. We needed a Secretary of Labor in place. General, would you agree that this clause now is not mostly used to deal with emergencies arising from congressional absence? That most modern presidents — and I say this sort of going back to President Reagan, and presidents of both parties — essentially have used this clause as a way to deal not with congressional absence, but with congressional intransigence. With a Congress that simply does not want to approve appointments that the President thinks ought to be approved. You know, absence in this day and age, this is not the horse and buggy era anymore. There's no real — there's no such thing, truly, as congressional absence anymore. And that makes me wonder whether we're dealing here with what's essentially a historic relic, something whose original purpose has disappeared and has assumed a new purpose that nobody ever intended it to have. Well, two answers. I don't think its original purpose has disappeared. I mean, the NLRB was going to go dark, was going to lose its quorum. As a result of congressional refusal, not as a result of congressional absence. Which gets to the second point, which is that it may be true, as a matter of raw power, that the Senate has the ability to sit on nominations for months and years at a time. But that is 100 miles from what the framers would have expected. If you look at what Hamilton said in Federalist 76 about the advice and consent role of the power that was rarely exercised and would operate, if at all, invisibly or silently. And in the early days of the Republic, advice and consent was a matter of days, not months and years. You are making a very, very aggressive argument in favor of executive power now. And it has nothing whatsoever to do with whether the Senate is in session or not. You're just saying when the Senate acts, in your view, irresponsibly and refuses to confirm nominations, then the President must be able to fill those positions. That's what you're arguing. I don't see what that has to do with whether the Senate is in session. Well, I do. I think the recess power may now act as a safety valve, given that intransigence. And that is actually quite consistent. But it isn't tied, then, to the availability of Congress, availability in the Senate. And I think you said throughout your brief that the rationale for the recess power is the President must be able to have the government functioning and staffed, even though the Senate isn't around. But now you seem to be departing from the Senate not available and making quite another justification for this. The Senate, I think, to be candid, the Senate is always available. They can be called back on very short notice. So what is it that's the constitutional flaw here? It isn't that the Senate isn't available. The Senate is available. It can easily be convened. So let me take a half a step back, if I could, Justice Ginsburg, and answer that question this way. You know, perhaps it sounds like this is an aggressive assertion of executive authority. But I'd ask the Court to think back to Federalist 51. And what the framers were most concerned about was that Congress, in the separation of powers calculus, was going to amass authority and drain authority and energy from the executive. And therefore, the executive needed to be fortified against those actions by Congress. And one specific way in which the framers decided to fortify the executive was by rejecting the notion that the appointment power should reside with the Senate. The framers considered that, and they rejected it. And the reason they rejected it, as this Court noted in its Edmund opinion, was to protect the executive against some quotations. But the compromise they settled on in moving away from that is that the President will nominate, and the Senate, if it so chooses, can confirm a nominee. You spoke of the intransigence of the Senate. Well, they have an absolute right not to confirm nominees that the President submits. And it seems to me that, following up on Justice Kagan's point, you're latching on to the recess appointment clause as a way to combat that intransigence, rather than to deal with the happenstance that the Senate is not in session when a vacancy becomes open. Well, but those things, there are often situations in which the Senate is not in session when a vacancy becomes open or needs to be filled, I guess is the more accurate way to say it. I'll give you another example, if I could, from the 1940s. Taft-Hartley gets enacted in 1947 in the summer. One requirement of Taft-Hartley is that the general counsel of the NLRB must enforce the ban on secondary boycotts within a fixed period of time, 30 or 60 days. Well, it turns out there is no general counsel of the NLRB at that time. Congress and the executive have come together to address those sorts of problems in a vast number of cases, by providing that there can be an acting general counsel of the NLRB to deal with that situation. Well, actually, Mr. Chief Justice, with respect to multi-member boards, the Vacancy Act doesn't cover them. That's one reason we have the problem here. But beyond that, the framers made a judgment that this wasn't going to be left to congressional largeness. That's why there's a recess appointment clause. Well, let's talk about your 1948 emergency. The Secretary of Labor, there was a vacancy in that post. The President has the authority to convene Congress. And whatever was the case in 1948 or in 1789, Congress can be back here in one day. Article 2, Section 3 says, he may, on extraordinary occasions, convene both houses. That's true, Justice Scalia. So what's the problem? If there is indeed this terrible emergency you're talking about, the President has the power to call them back. Well, I think it seems to me the framers made a different judgment because they gave the President both the power to call back in extraordinary circumstances and the recess appointment power. And if the framers had intended the power to call back to be the way to deal with vacancies during absences of the Senate — Yeah, but my only point is what the recess appointment power consists of cannot be determined on the basis that, well, there are going to be terrible emergencies. So it must enable the President to do this or that. Extraordinary emergencies are handled in the Constitution. You don't have to expand the vacancy appointment power in order to handle those. So what I would say about this, and also to your point, Mr. Chief Justice, is this. We have, I would submit, a stable equilibrium that has emerged over the course of this country's history between the two branches. After all, what we are advocating for here is the status quo. It is the equilibrium that has emerged since Congress, since the Senate, started taking lengthening intra-session recesses. Presidents started making recess appointments during those recesses. That began in the Civil War days. It's continued to the present. General, I think that's a really strong argument, but I have to say I'm not sure it applies consistently throughout each of the three claims that you make. Because if you're going to rely on history and on the development of an equilibrium with respect to what happens means, and if you're going to do that again with respect to whether intra-session recesses are included, then it seems to me you also have to look to history and the development of an equilibrium with respect to Congress's definition of its own power to determine whether they're in recess or not. In other words, your third argument about pro forma sessions, the history is entirely on the Senate's side, not on your side. And if we're going to take a kind of continuing practice and the development of equilibrium seriously, you might win on questions one and two and then lose on question three. Well, winning on questions one and two would be of great importance to the executive, but we also should win on question three, and here's why. There isn't a long history reflecting equilibrium with respect to the use of pro forma sessions in order to restrict the president's ability to use the recess appointment power. There really is no history before 2007 of this daisy-chaining of one pro forma session after another after another in conjunction with an order that no business shall be conducted with respect to it. Well, there's no long practice of doing it. There's also no long practice of rejecting it. But if I could take you back to that. You said that the pro forma sessions may violate the adjournment clause in the 20th Amendment. Would you also say that they violate the presentment clause? Because the Senate has passed legislation during these pro forma sessions, and the president has signed that legislation. Yeah, no, we don't. I think the right way to think about that is the same way that you would think about it. The Senate declares that it's in recess from August 1st until September 15th, and then comes back early because of an emergency that has happened, for example, with Hurricane Katrina. Once they're back in doing business, they're doing business. Now, what the Senate did with respect to the legislation Your Honor identified was they came out of pro forma session, they passed legislation, and they went back in under the order of pro forma session. It seems to me that we're searching here for a proper interpretation of the word session, which, after all, is in the provision that we're looking at. It talks about next session. And we have a long tradition of Congress defining what that session is. They have the first, this is what, the 113th Congress, I think something like that. And they have the first and second session. That's how their records are based. This is considered judgment by both houses of the legislative branch as to what session means. And it seems to me that that has a very powerful bearing on the question of inter- and intra-session appointments that we're arguing, forget that, when the vacancy happens too hot. And so why don't we defer to Congress as to what the term session means and say that this gives us guidance as to when there is a recess. There is a recess between those sessions. I don't think that that's an interpretation that really could be squared with the body of contemporaneous evidence from the time of the framing. And I would start with the text of the Constitution itself and the adjournment clause, which is at page 91A of the appendix to our brief. And one thing it says is that neither house, during the session of the Congress, shall, without consent of the other, adjourn for more than three days. It seems clear from that language that the session of the Congress is referring to the period that commences on the constitutionally prescribed date and continues until the Congress adjourns CNADA, because otherwise these recesses wouldn't be during the session of the Congress. It's also clear from this language that the framers at least contemplated the possibility of breaks longer than three days within sessions because they provided a mechanism to get permission to do it. But you're relying on adjournment. That does not have the word recess. No, that's right. But I'm going back now to think about what session means in the recess appointment clause where the session is also used. I would submit, Your Honor, that it means the same thing as it means here, which is the full session of the Congress. If it means the same thing, then you're tying the two together, which actually might have some validity. But wouldn't that require the definition of a recess to be a period in which both houses have chosen to consent to an adjournment? No, I don't think so, because the dictionary definition then and now of recess is a suspension of business, and you could have recesses of that kind, suspensions of business within sessions. That's Jefferson's Parliamentary Manual refers to recess by adjournment. Do you have an adjournment without a suspension of business? Aren't the two the same? Well, I'm just talking now, Justice Sotomayor, if I may, about the intra-session recess point. But I'm talking about tying the two together. Right. But with respect to putting the pro forma issue aside for a second, with respect to intra-session recesses, the meaning of the session, it seems to me, is the session, the full session, because you can have recesses by adjournment, as Jefferson's Parliamentary Manual said. And as I think I said earlier, there's quite substantial evidence that the term the recess at the time of the framing could refer to a break during a session and not just breaks between sessions. So I just don't think there's contemporaneous evidence from the framing generation that would lead you to conclude that intra-session recesses are not within the meaning of a recess. Well, where is this most surprising to me that you've said, and it's important to you, is not just the view of language at the time of the framing, but what the purpose of this clause was. I mean, this is a very well-briefed case. And I have looked at them. I've read them, actually. And I'll tell you, I cannot find anything so far, and I may have missed it. I'm asking. I can't find anything that says the purpose of this clause has anything at all to do with political fights between Congress and the President. To the contrary, Hamilton says that the way we're going to appoint people in this country is Congress and the President have to agree. Now, that's a political problem, not a constitutional problem, that agreement. And it was just as much true of President George Bush, who made six appointments, that happened previously, as it is with President Obama, who's made four. All right? So where, and he says this clause is a supplement, a supplement to the basic clause to take care of the timing problem. So what have I missed? Where is it in the history of this clause and its origination that it has as a purpose to allow the President to try to overcome political disagreement? I don't think that that's its purpose, but it is in the Constitution. The President has the authority. Well, if it isn't a purpose, can you give me an example where the language, particularly that word happen. I mean, your example was a good one, but I don't think it applies. That's a different matter. I can't, the language is over here. The number of appointments on happen is few. If you're worried about James Tobin, Congress has passed a law that can be taken as looking at a vacancy occurring when it occurs within 30 days of the beginning of the recess, which would have taken care of Tobin. So look at the language difficulty. Look at the comparatively small practice in that area. Look at the other ways to get around the problem, and then give me another example in the Constitution where you have both language and purpose pointing one place, and yet this Court, because of practice, has come to the opposite conclusion. Well, I don't think that language points unambiguously in one direction. Happen. I don't think, of course, battles happen. That's because battles occur over time. Give me an example with the word vacancy, where that word vacancy is used with the word is and not occur. A vacancy is an enduring state, and from the perspective of the... Yeah, but just give me a little English example where it's natural to say... I tried with my statutory example before. Your statutory example has to do with a battle, not a vacancy. No, it was an emergency. It was the statutory example about a financial emergency. Or a financial emergency. Correct. Which is the same topic of vacancy. I'm sorry. I'm asking you for an example with the word vacancy. That's what I'm in trouble with. Well, a vacancy is an enduring state. I'm not talking about the... I just say could you find an example, and I'm gathering from my answer you couldn't. Well, I think... And I couldn't either. Your Honor, maybe this statute or maybe the language in the Constitution looks unambiguously to you now, but it has been the subject of contention. It has been thought to be ambiguous from the time of George Washington to the present. And with respect to the question of the practice and there being... I don't think it's correct to assume that because there are a certain number of identified examples of preexisting vacancies being filled in our appendix that that's a sum total. I think this is far, far less than the sum total. It's been assumed to be ambiguous by self-interested presidents. Of course. Death is an enduring state. But if someone dies in 1941, you don't say he died in 1945. He's still dead. But his death happened in 1941. But the fact that may happen is a phrase that isn't always apt to describe an enduring state doesn't mean it's never apt to describe an enduring state. It's what Jefferson thought. It has been the understanding since the framing that there is ambiguity here. Your argument, your friend on the other side says one flaw with your argument is that it makes the words it may happen or happen during superfluous, that the clause would mean exactly what you say it means if you took those words out. And your response, the only one I could see on your reply brief, page 13, is that those words were put in there to, quote, confine the President to filling vacancies that actually exist at the time of appointment. Now, is that — do you really think that they put that language in there because they were afraid the President would fill appointments that don't exist? I don't know why they put the language in there, Mr. Chief Justice, but it doesn't — it isn't superfluous because it does serve that function, whatever their intent. One reason they could have put the language in is because they were afraid otherwise the President would have the power simply when somebody died two or three years before and they've had a big fight in Congress to save up all the controversial nominations and then put them through his recess appointments. That could be one thing they didn't want to happen. I don't know. Same problem. You do have the one that you got in your brief. This understanding goes back at least to 1823. And the work letter, in terms of her work, said, on the wording, maybe on the wording the case is not strong. But the purpose, he said, you would be following the letter and defying the spirit. That was the — on the question of when the vacancy — And we don't disagree with that. We think it's just what was said. There's no violence to the language and it's consistent with the purpose of the clause. And from the perspective of the purpose of the clause, the office is equally vacant whether that vacancy arose the day before or the day after the Senate wanted a recess. The Senate is equally unavailable to act because they're dispersed whether the vacancy arose the day before or the day after. And the public's need that the office be filled so that the laws can be faithfully executed is the same whether the vacancy arose the day before or the day after. You do have that very established practice that is completely in accord with the purpose and the structure. We sort of drifted away from the new practice, the pro forma session. And you were asked, suppose there was nothing in the resolution about they would conduct no business. It was an informal understanding that they wouldn't. But there is no express agreement that they're not going to conduct business. Then do you lose on that part of the case? I think that's a way harder case for us. I would agree with that, Justice Ginsburg. But there are two things. One is the formalities do matter. And two, going back to the point you made earlier, Justice Kagan, I think it's not an accident that there's a no business order in place. It's because that's what gives the senators the protection to know that they can leave town without somebody else going to the floor to conduct business. Suppose it was the exact same no business order, but the single senator who was there got up and asked for unanimous consent to name a post office. And every three days he got up and said, unanimous consent to name a post office, the post office is named. So they can do trivial business in each of these sessions. Would that make a constitutional difference? Well, I think if they did business each of the three days, then you wouldn't have a situation in which no business was conducted and you wouldn't meet the definition of a recess. But that's a different case. But that, again, suggests that the rule that you're asking us to establish is so easy to evade that why bother establishing it at all? The fact that it's so easy to evade suggests that this really is the question of how to define a recess really does belong to the Senate. No, I think the problem with looking at it that way, Justice Kagan, is that that's the end of the recess appointment power. You write it out of the Constitution if you look at it that way, because all the Senate needs to do is stay and proform a session until 1159 a.m. on January 3rd when that term ends and the next term starts. And then there are no intercessions. I totally take your point on that. But what I'm suggesting is they could just come back and by naming post offices have the same effect, that they would write it out of the Constitution as much as you say this does. Well, this does. This does. And whether something else might or might not, I guess we could try to fight that out if the Senate were ever to do it. But I assume if this Court were to hold that proforma sessions of this kind are not real and they don't defeat the President's recess appointment power, that maybe the Senate would think twice before. Well, what is significant is whether they're available to confirm nominees. Isn't that right? Yes. So suppose they say instead of no business will be conducted, no nominations will be considered. That would be a different case because they would be here. You know, they're not. So what? The point of the question is whether they're available to consider nominations. So if they say we'll do other business but no nominations will be considered, why isn't it exactly the same for purposes of the recess appointments clause? It's not because the definition of recess is when no business shall be conducted and that's exactly what the Senate said. I may reserve the balance of my time. Thank you, General. Mr. Francesco? Mr. Chief Justice, and may it please the Court, the Advice and Consent Clause imposes an important check on executive power. Each of our three arguments preserves that check and provides a separate and independent basis for affirming the Court below. The government's position, in contrast, would eviscerate that check, creating a unilateral appointment power available for every vacancy at virtually any time with advice and consent to be used only when convenient to the President. But your argument would destroy the recess clause. It would be, under your argument, it is totally within the hands of the Senate to abolish any and all recess appointments. Yes, Your Honor, and that reflects the fact that the recess appointment power is a contingent one. It arises only when the Senate chooses to trigger it by ending its session and beginning its recess. So the Senate always has the power to prevent recess appointments. The Constitution, however, gives the President corresponding powers. If the President thinks that the Senate is being derelict in its duties, he can convene an emergency session and he can force the Senate to consider his nominees. And if they refuse, he can subject them to withering criticism for being derelict in their responsibilities. But the one thing that the President may not do is force the Senate to act against its will. Nor should the President be permitted to do and run around the Senate's refusal to act because that conception of the recess appointments clause is at war with advice and consent itself. Can I ask you a variant of the question that Justice Scalia asked General Verrilli? Suppose we think that the language of the Constitution is perfectly clear in some respect, but that there is a 200-year-old consistent practice, agreement by the President going back to Washington and by the Senate that the language actually means something else. What would we do in that situation? Your Honor, I think that the language has to govern. And I would like to address the issue about the consequences of a ruling in our favor in this case. Of course, if you were to rule on the third question presented, it wouldn't call into question any past recess appointments at all, given the unprecedented nature of the appointments at issue in this case. But frankly, if you ruled on the first two questions, I don't think it would be particularly disruptive in terms of calling into question the decisions of past appointees. Justice Sotomayor, to take the Article III courts, for example, since 1960 there have only been four potentially improper appointments to the Article III courts, recess appointments. Each of them served approximately a year or less. Three were to the Court of Appeals, one to a federal district court judge in 1981. Mr. Winchester, I'm sorry, but could we go back to Justice Alito's question? Because I really have the same issue with your argument. You know, suppose that on one, let's say the happens argument, that your is at least the most natural reading of the statute, at least the way we understand the word happened today, and maybe a compelled reading, but the history points so much in the other direction and that that history brings with it a whole set of practices and traditions and ways of dealing with each other that has grown around a certain interpretation of what happens means, right? The idea that we would wake up one fine morning and chuck all of that because all of a sudden we happened to read the clause, I mean, that at least needs to be defended. Yes, Your Honor, and I believe that the relevant history actually supports us, that is the history at the time of the founding. I know, but now you're, again, assume that there is a 200-year-old established practice, everybody has agreed to it, but the text, when you really look at it, points the other way. Yes, Your Honor. I would dispute the premises, but I'll accept the premises for the purposes of the question. The political branches of the government have no authority, give or take away the structural protections of the Constitution. They don't exist to protect the Senate from the President or the President from the Senate. These are liberty-protecting provisions that protect the people from the government as a whole. So, if the Constitution is quite clear as to what those structural protections are, but the political branches, assuming for the sake of argument, have conspired to deplete them, that is illegitimate and it should be rejected by this Court. But that assumes something, which is, let's go back to the happenings words, that is so unambiguous that they knew it was unambiguous, but 200-year history, starting with President Washington, who filled two vacancies that occurred before the Senate broke, to almost every President thereafter, has done the same. So, why should we conclude that today's understanding is the same as the understanding of the founding fathers? Why don't we take their unbroken practice as giving us that definition? Yes, Your Honor, a couple of different responses. First of all, we dispute the government's historical account of President Washington's and the first four Presidents' actions. But even putting that aside, here, everyone who actually spoke to and addressed the issue at the time agreed that the text means precisely what it says, including President Madison, who refused to make a recess appointment to Andrew Jackson, the hero of the War of 1812, precisely because the vacancy had arisen during the Senate session and in its recess. Second, we also don't have an unbroken and never contested practice. Indeed, the Senate has regularly resisted. In 1863, the Senate passed the Pay Act, which prohibited pay to any appointee to a preexisting vacancy. So you don't have a kind of uniform and uniformity called practice. Let me ask you this. Suppose that we were to conclude that the history is simply too overwhelming to rule in your favor on the happens problem. Could we still use history to say that, or overlook history, to rule for you on the inter-intra-session point? Yes, Your Honor. How do we do that? From the time of the founding, is it because of the 80 years? I think it's longer than that. From the time of the founding until, I would say, 1948, there was a uniform understanding that the recess and the session, as used in the clause, were interchanging periods. You were either in recess or you were in session. And so an appointment made during the recess lasted until the end of the next session. Now, in 1921, Attorney General Dougherty's opinion kind of muddled things a bit because he assumed that if you took a long break in the midst of a long session, it broke that break into two recesses for purposes of the Recess Appointments Clause. But you still had that dichotomous view subject to the arguable and quite ambiguous exception of President Andrew Johnson. So what you see is from the time of the founding until 1921, there were some 63 mid-session breaks, all longer than three days, so all recesses under the government's definition. Yet during that entire period, with the arguable exception of Andrew Johnson, no president ever attempted to make a recess appointment. Mr. French, tell me if I'm wrong about this, but it seems to me that intra-session recesses really only arose in the 1940s or so, right? That there's the period with Andrew Johnson, and Andrew Johnson used intra-session recesses to make a lot of appointments. Other than that, intra-session recesses of more than three days that are not Christmas simply do not exist. So that as soon as intra-session recesses came to be, presidents started making appointments in them. Let me address it this way. I'm not sure I agree with the factual understanding, Your Honor. There were intra-session recesses longer than three days prior to 1867. I think there were some ten of them prior to 1867, including seven that were longer than ten days. And bear in mind, yes, they were Christmas recesses, but so were the ones at issue in this case. They were Christmas recess appointments. But I do take your point that intra-session recess appointments did not become very common. I should say it this way. Intra-session recess appointments did not become very common until the — really, they started with Truman, but then they broke off for a long time with three presidents, Johnson, Kennedy, and Ford, making no mid-session recess appointments. Then beginning in the Carter and the Reagan administrations is one that became very common, and particularly a very common way to do an end run around advice and consent. What happened in that period around 1970 is that's about the first time that you have intra-session and intra-session recess that's longer than an inter-session recess. And so now if we look from 1970 on, that's fairly common. And so all that's happening is that the presidents are appointing recess appointees during periods where they're out for a longer time. Now, how are we supposed to go and say that this thing of thousands of people on the recess part is unconstitutional? I mean, it isn't unheard of. What about the due process clause? Does that easily cover the language? Substantive due process? What about the interstate commerce clause and the doctrine of, you know, the implicit clause there? I mean, it isn't unheard of that over time language in the Constitution takes on a somewhat different meaning. Yes, Your Honor. So how do we, I mean, probably different judges have different approaches. But if I'm concerned about the basic practicality and the basic objective here, why would I agree with you? Yes, Your Honor. I'm certainly not going to attempt to resolve this Court's differences on those issues. Well, well. But the two examples that Justice Breyer gives are examples where we gave it a meaning that was different from what it said. We don't have a case involving this particular issue yet. That's precisely correct, Your Honor. And it reflects the fact that the recess appointments clause and the appointments clause in all of the structural protections, again, are not meant to protect the branches. If I do place more weight on this, should we? I mean, I do believe and agree with you to this point that this is basically a matter of politics for other branches. Basically. That doesn't help me resolve this. But it does lead over to this possibility. Congress did pass the No Pay Act. And then they passed the Pay Act. And in that Pay Act, on this happen part, which I think is the strongest, very strong for your side, but it defines the vacancy in terms of 30 days prior to the recess. And that would take care of most of these. You see, a vacancy could be defined as something that stretches because Congress says it stretches in terms of pay for 30 days. What do you think of that? And I'd love to know what the SG thinks of it. Yes, Your Honor. A couple of different responses. First, of course, the third question calls into question no past recess appointees. The third question, by the way, just to put in your mind, if you digress, in your answer, put in your mind what would have happened in 1830 if someone, when they had a nine-month recess, close to 10 months, someone who had the bright idea, well, you live near Washington. Go show up wherever we're holding our sessions and sit there for five minutes. And we'll stop President Andrew Jackson from making recess appointments. What would we be saying then? Sure. Well, I'll put my finger on that question and answer your first question first as to the Pay Act in 1940. The Pay Act in 1940, in our view, clearly repudiates the government's intercession view for the reason you put your finger on. It ties pay to the appointments being made either right before or after the session ends. So most mid-session recess appointees can't get paid under the Pay Act. With respect to the second question presented, at best, it creates three exceptions to the general rule against any pay to any preexisting appointees. So you've got somewhat of a compromise. I would say that's no more Senate acquiescence in the President's position than the President's acquiescence in the Senate's position when he signed that law. So to me, that's a jump ball. Coming back to your historical example, I think it reflects the fact that the Recess Appointments Clause is not about timing. It's not a temporal issue. It's about procedure. What it does is it creates a contingent power that arises when the Senate decides to trigger it. Back at the time of the founding, the Senators wanted to trigger that power. It was important to trigger that power because when they were gone, the President needed to be able to act unilaterally unless they wanted to be subject to a recall in emergency sessions every time they needed to confirm nominees. They obviously didn't want that. Today, the situation has changed, not the principle, but the historical context. And today, the Senators can get back to Washington, D.C., very easily. Suppose we have an inter-session break. It's three days. On your reading of the Recess Clause, in that three days, the President can fill up vacancies. Yes, Your Honor, because under the second question presented, there would not be very many vacancies in that context. Well, let's leave out the second question. Just on the first question. Because it seems to me if the rationale was when Chavez was out of town for six, nine months, of course the President has to be able to make the government work. But now you're saying that in that time, it's only three days, they're going to be there, available very soon to confirm. Let's say somebody dies on day one. The President makes an appointment on day two. You would say that's okay. Yes, Your Honor, but first of all, I'd say I don't think you can really separate it from the second question presented, because that's why it explains why it wouldn't have been much of a problem. Very few vacancies would arise during a three-day break, and so there wouldn't be that much of an opportunity to make those kinds of appointments. Let's put that aside. Let me assume you reject my argument on the second question presented. Then you're really in the world of the 1905 Senate report, one where they were dealing with President Roosevelt's midnight recess appointments, where he made them in between gavel drops. If you reject our argument on the second question, then I do think that you may need to confront the notion that an intercession recess is too short to make recess appointments. Not an issue in this case, because here the appointments came on January 4th, the day after Congress commenced the second session. So by anyone's definition, this was an intra-session recess appointment, not an inter-session recess appointment. And all of this really reflects the fact that the Recess Appointments Clause is a contingent power that arises only when the Senate triggers it, which is what gives the Senate the power to prevent the President from making recess appointments. If I could turn back to the consequences. Before you do so, I mean, is the Senate's power, in your view, so comprehensive that if they passed an order saying, we're actually never in recess? People can be reached, you know, we can call people back. So for purposes of the Recess Clause, we are never in recess? Your Honor, under the first question presented, I think the answer is yes, they could do that, because it really is the Senate's ability to trigger the power. In a sense, the Recess Appointments Clause is of a piece with the Inferior Officers Clause. The Senate always has the power of advice and consent. But what the President can do, what the Senate can do is authorize the President to act unilaterally in certain circumstances. It can authorize the President to act unilaterally with respect to Inferior Officers, and it can authorize the President to act unilaterally in certain time periods where it ends its session and begins its recess. So it's always within the Senate's power, and that's precisely why advice and consent serves as an important check. On the third question presented, I think where you're deciding whether or not a session is a real session, then no, I don't think the Senate could do that. I think that it's for the Court to look at the Senate's journal to see what the facts are, and those facts must be taken by this Court as undisputed. So if those facts show that there was a Senator who actually gaveled them into session each day, and that during that period they were capable of conducting business, as they were here at every session that they held every three days, then this Court would have to take those facts. Could you tell – let's go back to this. What's your definition of a recess? When the Senate actually says we're taking a recess? Yes. Whether it got the consent of the House or not? It's when the Senate – again, it depends on which question you're talking about. On the first question presented, the recess of the Senate is the period between when the Senate says that it is ending its session through an adjournment sine die, and the period when it begins its next session. Does it have to do that? By what command does it have to do that? Sine die? Yes. No, sine die or any – It does not have to adjourn sine die. That, though, in this country is the way that the Senate has traditionally signaled to the President that it was ending its session. And I think that's what it would have to do. Does it need the consent of the House to do that? Yes, Your Honor. It does. So does it have to do that in between the two congressional sessions? I don't – I think – no, I don't think it has to. I think the Senate can adopt its own rules for determining how it ends its session and how it begins a new one. I think the important point, though, is it has to communicate that to the President. So, for example, during President's – President Madison's time, the tradition was the Senate would dispatch a committee to the President to inform the President that it had ended its session. So the President now knew that it was in recess and the powers that imbue upon the President during that recess had been triggered, the recess appointment power. Here, ruling in our favor on the third question would, of course, call into question no past appointees. But I would like to – On the first question, does your argument depend on the fact that – on the assumption that the possibility of a lengthy intra-session break was never even contemplated by those who framed and ratified the Constitution? Because if they had thought about that, there's a real chance the Senate may take a two-month break over Christmas. Would there be any reason why they wouldn't have wanted the recess appointment power to apply there as well as at the end of the session? Your Honor, our argument does not turn on that, because to us it is not a temporal question, it's a procedural one. Back then, the Senate had the power not to trigger the recess, just like today. It has the power not to trigger the recess appointments power. The difference is not in principle, it's in historical context. At the time of the framing, they wanted to trigger the recess appointments power, because when they left during long periods of time, they wanted the President to be able to act unilaterally, since it was very difficult for them to get back. And if they didn't trigger the power, the only way the President could act unilaterally the only way the President could confirm nominees would be by convening an emergency session. Highly inconvenient. The historical facts today have changed, not the principle, but the surrounding facts. And today, it is very easy for the Senators to get back to Washington, D.C., and so they don't want to trigger a unilateral power. They're perfectly willing to be hailed back if necessary. I'm not sure I understand the answer. If the purpose is to permit the President to fill vacancies when the Senate is unavailable to consider nominations, and the country would be harmed by having these offices vacant for a period of time, why would that not apply to any lengthy break, whether it's at the end of the session or in the middle of the session? And so if you're arguing that it only applies at the end of the session, doesn't that possibility that there would be a lengthy break in the middle of the session? Your Honor, it is possible that they never thought about it, but even if they had, I don't think it would matter, because I think that the purpose that you've laid out is not quite the full purpose of the clause. The purpose was also to ensure that the President could not easily do an end-run around advice and consent, which, after all, is the principle method of appointment. And so what they did, as they did with respect to inferior officers, is they vested with the Senate the power in certain circumstances to authorize the President to act unilaterally. With respect to recesses, that authority was triggered when the Senate decided to end its session. The Senate did, for example, take seven mid-session breaks of longer than 10 days prior to 1867. It is inconceivable to me that the Senators at that time believed that they were entering into a recess that would have empowered the President to make unilateral appointments during those 10-, 11-, or 12-day periods. And that reflects the fact that the recess appointments clause is a contingent one that arises when the Senate triggers it. Mr. Francesco, can I ask a question about the second question presented, the happens question? Yes, Your Honor. And if you put aside all the history, and you look only at the language, and you look only at our own modern view of what happens is, that surely seems to favor your position. But given all the statements in the founding period itself about how this is ambiguous and it might have two meanings, if you look at the dictionaries of that time, so I went back, I looked at the Oxford English Dictionary, and one of the definitions of happens there is chance to be. Essentially the exact same definition that Thomas Jefferson said made this ambiguous. And we would never use happens in that way now. If you look at the examples that the Oxford English gives, they're laughable. Nobody would ever say that now. But it just suggested to me that maybe what we think is pretty clear is only pretty clear because one meaning of happens has, you know, over 200 years last. Well, Your Honor, I actually think the word happens had the same meaning then as it does now, which is why at the time of the framing, everyone who actually studied the issue, Madison, Hamilton, both of the first two attorneys general, Edmund Randolph and Charles Lee, agreed that it meant what it said. No, I don't think so, right? Essentially Thomas Jefferson says it could mean one thing or the other. And the other thing that he said, which is happens to exist, is sort of exactly this old definition, which is happens means chance to be. And then Jefferson in his other letters conceded that the Recess Appointments Clause, as it stood, was going to frustrate his ability to make appointments. I think happens continues to mean chances to be. We still use it that way, but we only use it that way when it is followed by an infinitive. I happened to see him. It means a chance that I saw him. Or, you know, 9-11, the destruction of the Twin Towers happened to occur on 9-11. But you wouldn't say it happened on 9-13 simply because it continued to be destroyed. I don't know what the OED examples that Justice King referred to were, but I bet they used happened followed by an infinitive. And I think we still use it that way. You know, I don't remember them exactly. I just remember kind of laughing at them. Actually, I think I remember what they were. And they were 1483. And it's 1490-something. And then there was an asterisk that said obsolete. And, in fact, I couldn't figure out what they were talking about. And, yes, Your Honor, but in addition, though, there's not just the word happened. It's preceded by three other words. That vacancy, that may happen. And the only purpose that those words serve is to constrain the universe of vacancies that are eligible for a recess appointment. Well, the Constitution, as it first was, it's now been amended. It's no longer part of the Constitution with reference to appointment at Senate. It uses the word vacancy in much the same way as the clause we're discussing here, and I think favors your position because if a vacancy happens by resignation during the recess of the legislature, then the governor can make the appointment. And you certainly wouldn't think that that could happen over three days or occur over three days. And it's even better than that because at the time of the framing, a governor tried to appoint somebody to the Senate pursuant to that clause where the vacancy had arisen during the legislative session rather than during the legislative recess. And the senators actually refused to seat that individual. So, yes, that further supports our position on that. Let us say anything before you about the language on the happen. I support you. But the practice and in particular the practicalities because you say, well, the president can make an acting appointment, make a recess appointment even. I mean, you know, they have much less authority, somebody appointed in that way, much less than a person who's been confirmed by the Senate. So if the government won't grind to a halt, it still faces a problem. And, Your Honor, that's a consequence of advice and consent. That problem arises not just when the Senate takes breaks but when the Senate is in session. The Senate could show up every day for an hour, sit at their desks, and announce to the president, we are not going to do anything, no nominations, no legislation because we don't like what you're doing. And, by the way, the only reason we're showing up here at our desks and sitting here for one hour a day is because we don't want you to be able to make recess appointments. Nobody would claim that the Senate was in recess during those sessions. Well, that is effectively what it was doing here. I would, though, like to address the practicality issue. I talked about how there have only been four recess appointments to the Article III courts that are potentially invalid since 1960. I likewise don't think if you were to rule in our favor on the first two questions that it would be particularly disrupted to the executive branch either. If you look at the government's appendix, I would hazard to say that most of those officials probably don't exercise much, if any, agency rulemaking or adjudicatory power at all. But as to those who do, going forward, the government can solve the problem through agency ratification of past decisions. Going backward, there are a variety of doctrines that would limit anybody's ability to actually challenge those past actions, including, for example, the APA's six-year statute of limitations on challenging final agency action, various finality rules that would prohibit a party from raising an issue that they could have but failed to raise in an earlier proceeding, and various justiciability doctrines like mootness, standing, and, Your Honor, the de facto officer doctrine, at least outside of the context of direct appeal. I think this constellation of issues probably explains why this is the first time this issue has reached this Court in 225 years. This is not to say that a ruling in our favor on the first two questions wouldn't have any past impact. It would undoubtedly have some. But as this Court's decisions in cases like Chadha and Booker and Blakeley make clear, this Court has never shied away from enforcing the strictures of the Constitution simply because it could have some impact on prior cases. Here, the structural protections of the Constitution exist to protect the liberty of the people. They were clearly transgressed with these unprecedented appointments, and therefore, we believe that the Court below should be affirmed. I'm happy to answer any additional questions that Your Honors may have. Thank you, Counsel. Mr. Estrada. Thank you, Mr. Chief Justice, and may it please the Court. As Justice Kagan recognized earlier in the argument, this case fundamentally is about who gets to decide whether the Senate is in recess, the Senate or the President. Our submission today is that the Senate gets to decide whether the Senate is in recess. Mr. Estrada, you said in your brief that that was true within wide limits. What are the wide limits? This is all about how the Senate chooses to arrange its affairs, Justice Kagan, under the rules of Proceedings Act. And what the Court said in the Bolling case was that the exercise of rulemaking authority by Congress was almost absolute and beyond the challenge of anybody or tribunal unless it usurps some independent constitutional authority. The only possible offer here that the Solicitor General has as to how the Constitution could have been violated by the actions of the Senate in arranging its own affairs is the notion that this has invaded the purported recess appointments power of the President. And the reason, as we say in our brief, why that is completely insubstantial is because, as the Solicitor General recognizes in the closing two pages of its brief, the Senate, by the design of the Constitution, the Appointments Clause, the primary method of appointment, has an absolute veto over nominations. The framers could not have been more clear that the standard power of appointment was a joint power of appointment. And therefore, the Solicitor General is forced to concede that this appointment power, this right that the President is asserting here as a stop on the exercise of the rulemaking authority, is a subsidiary power that only arises if the Senate chooses to recess. Is the Chief Justice's example before, if the Senate just said we're never in recess for purposes of appointments, would that be permissible? If the Senate says we're never in recess and the Senate then is not in recess so that it can exercise the duties of its office as it does here, yes, it would be. If the Senate says we're checking out and going to Hawaii, we'll never again be in Washington, coordinate very nice this time of the year, that would not be permissible because, A, the Adjournments Clause requires the consent of the House for the Senate to be not only gone for three days but to be in a different place. And second, the Senate cannot leave the chamber other than with the consent of the House. And maybe if the Senate has effectively given up the business of legislating, in that case maybe the President could say that it is, quote, a recess. Now, the fundamental problem with the President's position here is twofold. We have Senate records. There is the Journal Clause of the Constitution directs each House of the Congress to have a journal of its proceedings. The Journal of the Senate, which is in relevant part printed in our appendix, shows that on each of the disputed dates, the Senate was called to order and then adjourned. It is an official record of the Senate. It says the Senate was called to order and then adjourned. It doesn't say two guys who happen to be Senators met at a bar and had a beer. The official records of the Senate say the Senate was called to order and adjourned. And under the Rules of Proceedings Clause, that ought to be conclusive, full stop. But the end of it is exactly the same if this all took place during the nine-month intercession recess in 1835. It would be the same unless the Senate chooses to recess. No, no, no, exactly. Same facts, same facts. Right. And therefore, in your view, the clause, even if they were all scattered to the winds in 1835, it would have been not possible for President Andrew Jackson, if I have that right, to make the recess appointments. This is prior. The executive at the time could have attempted to construct the same type of argument that the executive is trying to construct here. Your view would be the Court should reject it. Yes. But here, it is even a weaker argument because one of the oddities of the case is that as the Senate and the country have all moved into the modern age, the rules of the Senate tend to provide for the Senate to be available at the drop of a hat. If you look, for example, at Rule 9, you can always get, you know, the communications from the House or from the executive. If you look at Rule 26 of the Senate, committees can meet whether or not the chamber is actually in session. You know, the business of the Senate is ongoing. And therefore, in the modern world, it is even much, much, much different than even the hypothetical. You say anything that would, on this, if you want to, that would turn it back to the practicalities. Imagine, hypothetically, that I would have thought President Theodore Roosevelt acted unconstitutionally when he tried to make all of his appointments, dozens and dozens, during a two-second intercession. In 1903. Yes, yes. Intercession. Constructive recess. Yes, yes. And by converse reasoning, the Congress would not have been able in 1835 to prevent recess appointments simply by having a nearby senator show up for one second once every three days over a nine-month period. It seems to me what goes around comes around. Well, let me take that as an opportunity, because I think it does raise, you know, the question to speak to the implication that the Solicitor General makes in his brief, that the Senate as a body doesn't have a view on whether it was in recess or in session. For the reason that I started out by outlining, the Senate's official records do show that the Senate was in session on each date, and therefore, the Senate does have an official view. But from the practical point of view, we do know that the Senate has a view on these things. And how do we know? The President's party controls the Senate. If the Senate wanted to recess, Rule 22nd of the Senate says that's not a debatable proposition. If a majority of the Senate wants to recess, even before the abolition of the filibuster, a non-debatable proposition. So the Senate says, which is controlled by the President's party, says we want to recess. We want to go away. We don't care if the President has this power. They vote for that. House says no. What happens then? Article 2, Section 3 of the Constitution, the fight goes to the President. And it is in that event that the President gets to adjourn him until such date as he shall see proper. So if the Senate had any view that he wanted to recess, they could have had a vote, and the issue would have ended up in the White House, in the lap of the President. He had plenary constitutional power to give himself an intercession recess by terminating the session and have a real recess appointment power if he could find somebody whose vacancy had actually arisen at the time. But this is the cockeyed way of going about the instruments of the Constitution. There is no power in the Constitution to use the recess appointment clause to overcome the opposition of the Senate to the President's nominees. And for all that we hear about today, which has to do with how the heaven will fall and the parade of horribles, there is no parade and there is no horrible. The only thing that will happen is that the President, heaven help us, will be forced to comply with the advice and consent that the appointments power, excuse me, that the appointments clause actually calls for. That was not viewed as an evil by the framers. That was what the framers unanimously agreed was going to be the principal means for appointments for the principal officers of the union. If there is a three-day recess between the sessions, then your argument is that is a recess and the President can make appointments in that time. Justice Ginsburg, that is a very interesting and somewhat difficult question. On the facts of this case, there is a substantial question, which no one really has litigated, as to whether there was in fact an intercession recess, whether the first session of the 112th Congress ended on the morning of January 3rd, and therefore we have the same Teddy Roosevelt situation, or whether by adjourning on December 30th and contemplating no further meetings until January 3rd, whether that in effect was a CNADA adjournment that ended the first session of the Congress. If the President had the same view about the nature of the performance sessions, he could have taken the view about the sessions between December 17th and January 3rd, and could have had a better legal argument in attempting to claim that between December 30th and January 3rd, there was at least an arguable intercession recess. And he did not do that. Why didn't he? Because by waiting until the convening of the first session of the second session of the 112th Congress, by making an appointment on January 4th instead of the morning of January 3rd, he gives an extra year to his appointees to serve. That shows that this is indeed the bottom of the slippery slope on the recent appointments clause. It is a complete abuse of the process. It is being used for no other purpose than to overcome the Senate opposition or the Senate disinclination to agree with the President's nominations. What the framers contemplated in coming up with a joint power of appointment was you have to act jointly. You have to play nice. And in a country of 300 million people, when the President wants a nominee and the Senate does not agree, it is always possible for the President to come up with another nominee who is even more qualified and acceptable to the Senate. The key here is acceptable to the Senate. He has to be able to proffer someone to the Senate that the Senate is willing to engage in a joint power of appointment. Mr. Estrada, in your earlier example, you said that if the Senate decides to recess and the House doesn't approve, that the President can then do it. Is it your belief that a recess is only something that both Houses have agreed to? A break in business that both Houses have agreed to? I don't think so. It is usually the case, Justice Sotomayor, but not necessarily. So what do you mean, why does the President have to adjourn the House in your example? If the Senate votes tomorrow to recess, can the President appoint, at least in your view, any vacancy that occurs during that recess? If the Senate has been recessed without date, so that the session of the Senate is over, even if the President, under Article 2, chooses to leave the House in session... Why do you need a date? In what rule makes a recess defined as something without date? This takes us back to the first argument, and I think the contemplation was that the recess would be the period of time that intervened between the ending of a session of the Congress and the beginning of the next. Here... It always had a date, because we knew January 3rd was a new session. Well, that wasn't true until the 20th Amendment. The date was a much different date in the original Constitution. But to answer your earlier question, it is usually the case that a recess is going to be longer than three days, but it needn't be. If the Senate finished all of its legislative business, for example, in this year, on December 30th, 2011, and then voted to adjourn Senate D.A., and did not again meet until the beginning of the second session of the Congress on January 3rd, that would be an intercession recess, even though it would not be one that would require the consent of the House. But in the usual case in which a recess is taken for an extended period of time, it would be the type of break that the framers contemplated would need the consent of the House. And the reason for that should be obvious. We have a system of a bicameral legislature. The Houses, too, are supposed to work together to accomplish the business of the people. If the House is working on something and the Senate wants to go away, or vice versa, they need the consent of each other because they may need each other to frame out ongoing legislative projects. And if the House, in its own judgment, thinks that the Senate is sufficiently available to the House in our bicameral system so that it has been full compliant with the adjournment clause, it is very difficult to see how in the agreement of both Houses of Congress that the Senate is, in fact, effectively available, that is there with its full power of unanimous consent every third day. If the House thinks that that is adequate for the discharge of its constitutional functions and the constitutional functions of the Senate, it is very difficult to see how the President gets to second-guess that. One final point that has to do with the Solicitor General's insistence on the no-business language, Rule 5.1 of the Senate makes very clear, it's also in our appendix, that any business may be conducted at any time without notice by unanimous consent. And so that effectively what we have here is merely an announcement by the Senate that between December 17th and January 23rd, only unanimous consent business would be agreed to. Thank you, Counsel. General Verrilli, six minutes. Thank you, Mr. Chief Justice. Let me begin with a couple of points on the intra-session recesses. With respect to the question that Justice Alito raised, it would have been perfectly familiar to the framers that a legislative body could take an intra-session recess. Jefferson's parliamentary manual, written while he was Vice President and presiding over the Senate, specifically refers to recesses by adjournment that occur within a session and the session resumes when they're over. The adjournment clause itself contemplates the need for approval by the other branch for a period longer than three days during the session. I think it's difficult to imagine that if, as Justice Alito's hypothetical suggested, that the Senate had in the first years under President Washington decided to take a two-month intra-session break, that President Washington wouldn't have been able to staff the offices of the fledgling republic using the recess appointment tower. If we agree with you on the first question, then there needs to either be a number or a functional test. I don't know where the number would come from, and I don't know how the functional test would play out. Maybe you could say just a word about it. We think the number should be the number in the adjournment clause, three days or less. Presidents have exercised restraint, and there haven't been recess appointments of periods below 10 days, but we think that would be the line. Now, with respect to the presence of that in the adjournment clause, but the absence of any number in the recess appointments clause, how do you explain that? Well, I think that there isn't really a need for explanation. A recess is a suspension of business, and what the adjournment clause says is if you're gone for three days or less, you're not really suspending a business, but if you're gone for more than three days, you are. And I think that's quite consistent with the argument that my friends on the other side are making. Now, with respect to the history on intra-session recess appointments, really, if you look at the congressional directory, which is a document that we cite in our brief, and you just look at the column that says intra-session recesses, you'll see page after page of blank space until you get to the Civil War era, when intra-session recesses become more frequent. And intra-session recess appointments really just precisely parallel the increasing use by the Senate of intra-session recesses. And you argue that the Senate sort of acquiesced in that and everybody's come together, but what would you expect the Senator to do? Well, if they say, you know, the President appoints somebody during a recess contrary to the Respondent's view, what's the Senator who objects to that supposed to do? Well, a couple of things about that, Mr. Chief Justice. The Pay Act, of course, was first enacted in this period, in the 1860s, when the first intra-session recess appointments occurred. The Pay Act, even in its original form, never said anything about trying to restrict intra-session appointments. If Congress really felt that these were improper, they could have done what they did in the Tenure of Office Act and passed a statute making it a crime for somebody to take one of these appointments, but they didn't do anything like that. But you would object to that, wouldn't you, on the same grounds that you're objecting here? Well, we would, but in terms of — Well, then that's not something that's effective for the Senate to do if you think it's unconstitutional. But in terms of an expression of their disagreement as opposed to acquiescence, it would certainly be an expression of disagreement, and it didn't happen. Well, that'll show. The Senate says, we don't agree with your recess appointment. And you say, well, that's too bad. The appointees still in office. But they didn't, I guess, would be the point. Well, some of the Senators did. Senator Burr famously objected to the President's assertion at that point. Yeah, but he famously objected to it, Mr. Chief Justice, by saying that the intra-session recess ought to be 30 days or longer, not that intra-session recesses are inappropriate as a matter of constitutional power. So I actually think that's just haggling about the length of the recess, not about the existence of the power. Now, if I can move to the question — No, no, I just want to make sure I understand. Your idea is the Senator who objects should do what? Well, a Senator who objects can say whatever the Senator wants, but we don't have a historical record of objection. We have a historical record of acquiescence. But suppose the Senator says, look, I object to that. I think it's unconstitutional, but I'm not going to — what can I do? The only thing to do is impeach the President, right, for violating the Constitution. And he says it's not worth it for the — one of the officers on the NLRB. The Congress as a body thought that these were inappropriate. They could take legislative action to try to limit the President's authority, and they just never have. Well, but you say that action would be totally ineffective. Well, we agree on the — we certainly agree on the criminalizing point. But in terms of the Pay Act, for example, they just never — in their original consideration of the Pay Act, they never tried to address this. Now, if I could turn to the — And people object all the time to things that, in fact, they can't do anything about, right? And yes, Your Honor, and of course — and that's an individual objecting, and it's not the Senate objecting. But there were reports, you know. There were reports — remember? Sorry, I didn't mean to — your six minutes couldn't be up. No, take a few more minutes. I was thinking the same thing, Your Honor. So there were a couple of committee reports, but I believe those were on the Happen issue. And let me turn to that, if I could. Now, Your Honor pointed out the number of — on Happen's number of appointments. As I said, don't take that chart as comprehensive. We said in our brief it's not. We think there are many more. And, of course, 39 Presidents have made those appointments. Now, the purposes of the clause, as we discussed earlier, I think are far better served by our reading than the other side's. Jefferson gave a reasonable textual reading. And then Your Honor asked about the Pay Act. The Pay Act, of course, says if the nomination — if the vacancy arose within 30 days, but it says something else, which is if a nomination is pending. But I'm — if 30 days, and the reason I'm doing that is this seems to me, hypothetically at least, a real matter for the political branches to resolve among themselves. Now, we have to decide this. So I thought, well, why not look and see what Congress objects to the least? And I got that 30-day thing from the Pay Act by analogy. So I want to get your view on that. Yes, of course. And what I would point out by analogy also is that there is another provision in the Pay Act, the very same statute, that says so long as a nomination is pending, even if the vacancy arose more than 30 days, it's the same expression of Congress's views about what's appropriate. What they care about is a chance to exercise their advice within 30 days. Well, that was that Senate. I mean, that's not the Senate that's sitting now. I mean, you're attributing the views of one Senate to the Senate over time. No, that's an expression of the law of the United States. I'm really interested in how you think the 30-day idea, if practical, plays out in terms of your concerns. Well, I think it — as I said, I think there's an equilibrium here and the 30 days doesn't fully capture it. And let me just talk about that, if I could. Briefly. Yes, thank you, Mr. Chief Justice. Briefly. The vast majority of appointees are submitted for advice and consent. That was true historically. It's true now. The vast majority of recess appointees are subsequently confirmed. So it's just not the case that this is an end run around the advice and consent role of the Senate. And there are powerful reasons, of course, why Presidents do that. They don't want to have temporary appointments that they've got to then deal with vacancies again. They don't want to unnecessarily create interbranch friction. The real problem I would submit here is that if you go with Respondents on the two underlying issues that the D.C. Circuit ruled on, you really are writing the recess appointment power out of the Constitution. And that's antithetical to the liberty-enhancing properties of separation of powers that Madison described in Federalist 51, because ambitions are counter-ambition. You shouldn't disarm one side. Thank you. Thank you, General. The case is submitted.